**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JENNY CHAU,

                    Plaintiff,

        v.

RYAN DONOVAN, GRANGER
MANAGEMENT LLC, and GRANGER
MANAGEMENT HOLDINGS LLC,

                    Defendants.

Docket No.:  18-CV-3365

**JURY TRIAL DEMANDED**

## <u>VERIFIED COMPLAINT</u>

Plaintiff Jenny Chau ("Chau"), by her attorneys, Whitney Law Group, LLC, complaining of the defendants Ryan Donovan ("Donovan"), Granger Management LLC, and Granger Management Holdings LLC (collectively "Granger") (all defendants are referred to collectively as "Defendants"), respectfully alleges, upon information and belief, as follows:

## <u>INTRODUCTION</u>

As set forth in detail below, the facts of this case show how Donovan engaged in a pattern of behavior designed to mislead and take advantage of Chau for the purpose of engaging in sexual relations with Chau through the gross misuse of his position of power. Donovan's efforts were first manifested in his dangling a purported $25-$50 Million investment in Chau's new venture fund in an overt attempt to extract sexual favors from Chau. On April 19, 2017, after a dinner meeting with Chau and members of her team, Donovan compelled Chau to remain after the dinner purportedly to discuss the venture fund. Instead, Donovan fed Chau drinks in an effort to get her drunk. Donovan convinced Chau to ride in his Uber, then forced his way into her elevator, then her hotel room, and then assaulted Chau sexually, against her will.

In the months that followed, Donovan continued to abuse his position of power and seek sexual favors from Chau by enticing her with the "carrot" of a huge investment, which Donovan knew Chau desperately needed to start the new fund. When Donovan could no longer realistically offer the investment, his enticement switched to offering Chau a job at Granger for a salary of $250,000 and promises of bonuses that averaged $500,000 or more. Throughout all of his job offer efforts, Donovan made it explicitly clear that the job offer was conditioned on Chau's willingness to engage in sexual relations with Donovan and his wife. In October 2017, when Chau met with Donovan to discuss details about the potential job, Donovan inappropriately touched Chau again, but Chau refused to engage in sexual intercourse. Within days of Chau's refusal, Donovan withdrew the job offer and they ceased communicating.

This action seeks to recover damages for assault, battery, intentional and negligent infliction of emotional distress, vicarious liability against Granger for Donovan's conduct, and *quid pro quo* sexual harassment in violation of New York State Executive Law § 296 and New York City Administrative Code § 8-107.

## PARTIES

1.      Chau is a resident of Morgan Hills, California.

2.      Donovan is a resident of New York, New York. Donovan is the Principal and Chief Compliance Officer for Granger.

3.      Defendant Granger is a Delaware limited liability company with its principal place of business located at 17 State Street, New York, New York. Granger is what is known in the investment industry as a "family office" investment fund, which invests money on behalf of a limited number of wealthy families.

## JURISDICTION AND VENUE

4.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

5.     Venue is proper in this Court because both defendants reside within this judicial district.

## FACTS

### Jenny Chau - Background

6.     Chau was born in Vietnam to Chinese parents. When she was four years old, her family moved to England to seek refuge from the war in Vietnam. Chau and her family moved to Australia when she was nine years old where she lived well into young adulthood. Her father died when she was 16 years old. She became the sole breadwinner for her family.

7.     Chau's first language is Cantonese.  English is her second language.

8.     Chau attended Charles Stuart University, in Sydney, Australia, where she obtained a Bachelor of Business, with a major in finance, in 2003.

9.     Chau moved to Brooklyn, New York in September 2003 after becoming engaged to an American citizen. Chau married her now ex-husband in Brooklyn, New York. She lived in Brooklyn for nine months before moving to the San Francisco Bay Area.

10.     Chau lived in the San Francisco Bay Area for eight months while waiting for her green card to be approved.  In 2005, she obtained her green card to begin working in the United States. She then moved back to New York City at the end of 2005 where she remained for 12 years.

**Chau First Meets Donovan**

11.     Chau first met Donovan when she worked in the accounting group at Bear Stearns in 2005. The two worked in the same group for approximately one month but did not work closely together.

12.     Chau held several positions between 2005 and 2012 in New York City. In 2005, she worked at Deutsche Bank as an Associate in the structured equity finance group. In 2006, she moved to the commercial real estate group. Chau worked at Natixis Alternative Investments as a Controller between June 2008 and November 2012.

13.     While living in New York City, Chau rarely saw or communicated with Donovan.

**Chau Moves Back to California**

14.     Chau left New York City in April 2013. She moved back to the San Francisco Bay Area, and ultimately settled in San Jose in 2015.

15.     She frequently made trips back to New York City. While visiting friends in New York City, Chau and Donovan met up for drinks. He stated that he would love it if she came and worked with him at Granger. Chau expressed she was not interested in moving back to New York City.

16.     Chau began working at Morgan Stanley in the Wealth Management Department before joining HP Tech Ventures, Inc. in Palo Alto, California in July 2016. HP Tech Ventures, Inc. was comprised of two separate entities HP, Inc. and HP Enterprise.  Chau worked as an Associate in a venture capital group of HP, Inc.  While she was working at HP, Inc., a friend approached her to see if she would be interested in raising capital for MotiVentures, a new venture fund.  She agreed.

**Donovan Dangles $25-50 Million Investment**

17.    On January 31, 2017, Chau texted Donovan to advise that she would be in New York City at the end of March seeking to raise funds for MotiVentures, a new venture fund based in Silicon Valley. Chau inquired whether Granger might want to invest in or partner with MotiVentures.

18.    Donovan responded that same day asking for more information about MotiVentures and the background of the partners. Chau explained that the venture fund would invest in areas of artificial intelligence, additive manufacturing, synthetic biology, and digital healthcare. Donovan told her to let him know when she locked down dates for visiting New York City, so they could schedule a meeting.

19.    In February 2017, Chau was laid off from HP, Inc. She began raising capital full time in an effort to get MotiVentures off the ground.

20.    Chau told Donovan that she had been laid off from HP, Inc., so Donovan was fully aware that if Chau failed to raise capital she would be out of a job.

21.    On February 16, 2017, Chau asked Donovan to attend a 30-minute phone call with one of her venture partners. He agreed and stated that if it made sense to do a follow-up after the phone call, then the two could get dinner when Chau is in New York City.

22.    The call took place on February 22, 2017. Afterwards, Donovan said the venture fund sounded interesting and exciting and that he would be in touch with Chau after he spoke with Granger internally.

23.    On March 1, 2017, Donovan informed Chau that one of his partners, Andy Walters ("Walters"), said that the fund sounded interesting but wanted to talk to his other partner, Geraldine McManus ("McManus") prior to investing. Donovan confidently assured

Chau that Granger would probably invest $25-50 million because his partners trusted him. Donovan explained that he could convince his partners to invest in Chau's fund.

24.     An initial investment of that size is extremely large to a new venture fund.

25.     Almost immediately after Donovan informed Chau that Granger would probably invest $25-50 million, he began to drive the conversation to be sexual in nature. For example, on March 3, 2017, text messages revealed that Donovan stated that if Granger declined to invest then he would offer $5,000 of his own money into Chau's fund if he could have a threesome with Chau and his wife.

26.     Chau and Donovan continued to communicate. Throughout the communications, Donovan persistently spoke about getting Chau to drink to be more fun. He said he often thought of the celebrations the two would have if Granger invested.

27.     Chau went to New York City on March 30, 2017, with the hope of securing an investment from Granger. Ultimately, Donovan cancelled the meeting because of other work obligations. They rescheduled the meeting for April 19, 2017, when Chau was expected to be in New York City again. Chau informed Donovan that her partners in MotiVentures would also be joining the meeting.

28.     At some point prior to the meeting, Chau provided to Donovan MotiVentures's Limited Partnership Agreement to review in advance of the potential investment.  This document is a 40-page, single-spaced, complex legal document.

29.     On April 3, 2017, Chau informed Donovan that if she did not obtain funding that she was probably going to be fired from MotiVentures. Donovan assured her he was still working on the funding. He attempted to convince Chau to change her flight to stay in New York City an extra day. Donovan explained that if she changed her flight the two could get dinner and

he could learn something that could change his colleagues' minds from a "maybe" to a "yes" with regard to investing in MotiVentures.

30.     When he communicated with Chau during this period, Donovan frequently relayed his fantasies about having a threesome with Chau and his wife. He described these fantasies to Chau in explicit detail.  In so doing, Donovan continued his pattern of linking the $25-$50 Million investment to sex.

31.     At some point prior to mid-April 2017, Donovan clarified for Chau that the potential investment was the bottom end of the range he initially stated, or $25 Million.

**April 19, 2017**

32.     On April 19, 2017, Donovan, Chau, and Chau's MotiVentures partners all met for dinner in New York City to discuss Granger's investment. Chau's partners gave their standard pitch to Donovan.

33.     Donovan then told Chau that he wanted to speak with her alone after the dinner, to discuss the "character" of her partners. After dinner, Chau and Donovan left the restaurant and went to the roof bar at the Gansevoort Hotel. Once alone, Donovan began ordering drinks for Chau. Although they briefly discussed Chau's MotiVentures partners, Donovan confessed that he really didn't care about her partners, and he was only investing "because of her."

34.     Donovan continued to feed Chau drinks, with the intent to get her drunk. Chau is a very petite woman, who stands about 5' 3" tall and weighs approximately 112 pounds. After several drinks, Donovan began touching Chau inappropriately at the bar.

35.     After a while, Chau told Donovan that she was tired and was going to order an Uber and leave. While Chau was in the bathroom, Donovan ordered an Uber. He then convinced Chau to ride in his Uber, falsely saying (unbeknownst to Chau) that her hotel was "on his way

home." She told Donovan that she did not want him to come to the hotel, and that she wanted to go to bed because she was very tired because she had flown in that day from California and arrived at 4pm. Against her objection, the two got into the Uber and once again he touched her inappropriately.

36.     When they reached Chau's hotel, Chau asked Donovan to leave. She repeatedly asked him to "please go home" when they got out of the Uber, when he followed her into the lobby of the hotel, and when he forced his way onto the elevator. He refused to leave. Chau hesitantly opened her hotel door to which he stated he wanted to see what the room looked like then powerfully pushed past her into the room. Donovan is much stronger and bigger than Chau. He immediately began touching her in a sexual way. She continued to ask that he leave and attempted to push him away. He removed his pants and forced himself on top of her. In a last-ditch effort to get him to stop, she stated, "I'm not on the pill" in the hope of convincing Donovan not to engage in forced sexual intercourse, which she greatly and imminently feared he would do. Donovan then engaged in non-consensual sexual acts with Chau, which included sexual groping, kissing, very painful digital penetration, and concluding with him masturbating next to her in the room. When he finished, Donovan left.

37.     The next day, Chau was upset with what had happened the night before and was in a great deal of pain from the forced digital penetration.

38.     She did not know what to do in response to Donovan's conduct, as she did not fully comprehend at the time that it was wrong or that she had legal rights. Chau had never been educated or trained in U.S. laws concerning sexual misconduct in a business setting.

**Post-April 19, 2017 – The Investment Opportunity Vanishes**

39.     After April 19, 2017, Donovan continued to contact Chau via text message. Chau was disengaged but asked when he would talk to Walters. Donovan stated that he would talk to Walters and McManus the next day and give Chau feedback early the following week.

40.     On April 23, 2017, Chau inquired whether Granger's counsel had had a chance to look at the documents relating to the investment. Donovan dodged the question by stating he'll have an answer soon but then changed the subject to sex.

41.     At one point in the communications, after Chau pressed him about Granger's comments or proposed edits to the LPA, Donovan told her that Granger was "OK" with it. Upon later reflection, Chau realized that she should have seen this as a signal that Donovan was not serious about investing, as the lawyers for investors virtually always have comments and edits to the LPA documents associated with venture fund investments.

42.     The following months after the incident, Chau continued communicating with Donovan because she did not want to lose the potential investment. Donovan continued to use his position of power and influence at Granger to string the investment along until May 2017.

43.     On May 9, 2017, Donovan informed Chau that Granger was not interested in investing in MotiVentures. He said he was very disappointed because he was looking forward to the "celebration" the two would have had if Granger invested. Two days later, he stated that if things do not work out [with her current job] he would find a spot for Chau to work for him at Granger

44.     The communications between the parties became sparse after Donovan informed Chau of Granger's decision not to invest; however, when Donovan did text Chau, the messages continued to be sexual.

**Job Offer to Work at Granger**

45.     Shortly after Donovan informed Chau about the decision not to invest, he next began to dangle a lucrative job opportunity in front of Chau.

46.     On June 8, 2017, Donovan explained that it would be helpful for Chau to continue to be "nice" to him, because he could say good things about her to Walters and McManus for a potential job.

47.     He continued to send her sexual text messages in June 2017. Chau often switched the conversation when he began speaking sexually.

48.     Donovan repeatedly told Chau that he wished she lived in New York City. He continued to assure Chau that he had the authority to hire her at Granger. On June 14, 2017, Donovan told Chau, "getting you a job with me is easy…that's 99% my call."

49.     When referring to the job at Granger, Donovan repeatedly told Chau that the base salary would be $250,000.  He also told her that bonuses were large, and often averaged $500,000.

50.     Donovan made it clear to Chau that he expected that her agreeing to engage in various sexual acts with him, or with him and his wife, would be required. At one point in June 2017, when discussing the job and salary with Chau, Donovan stated, "and you might be able to do some things that would get me to pay you more."  He was using his power to attempt to lure Chau into having a sexual relationship with him. They began discussing start dates and how Chau would have to come to New York City to interview.

51.     On June 29, 2017, Chau indicated to Donovan that their encounter in April was not consensual and that she was angry about it. Shortly thereafter, Chau sent Donovan a link to

an article about a Silicon Valley executive who had been accused of making inappropriate advances towards women in the workplace.

52.     On July 5, 2017, Chau demanded that Donovan stop speaking to her in a sexual nature because it was offending her. She stated she would rather talk business. Chau then once again relayed that their April 19th encounter in New York City was not consensual and that she did not want to be hired because of any sexual favors. Donovan responded by explaining that that conversation prevented him from wanting to do any type of business with Chau. He, once again, used his power to threaten to take the lucrative job opportunity away from Chau.

53.     Nine days later, Donovan relayed that Granger had acquired another family to invest in the company. Once again, Donovan told Chau she should come work for Granger. Days later he said he wanted Chau to meet Walters and McManus, his bosses, but did not want to pay for Chau to fly out to New York to meet them. Instead, he was going to fly out to San Diego in October 2017 for a compliance conference. He wanted Chau to take the 1-hour flight from San Jose to San Diego to meet him there to discuss the job. He insisted they stay in the same hotel.

54.     In late October 2017, the two met in San Diego. They discussed salaries, the type of work Chau would do, and Granger in general.

55.     Whenever they discussed the terms of employment, Donovan would always punctuate the discussion by stressing, and "we can have fun too." By this, he meant engaging in sexual relations with him and/or his wife.

56.     Donovan and Chau did not engage in sexual relations despite Donovan's repeated requests and physical overtures. Donovan made several sexual advances toward Chau during their time at the San Diego conference, including groping and touching her inappropriately at the

hotel bar. Chau told Donovan to stop, but he persisted. Chau could see that Donovan was very frustrated with her consistent refusals to engage in sexual relations with him.

57.     A few days after Donovan and Chau returned home from the conference, Donovan notified Chau that Granger could no longer hire her. Thus, within days after Chau made it clear that she was unwilling to engage in a sexual relationship with Donovan, the job offer evaporated.

**Impact of Donovan's Conduct on Chau**

58.     Throughout 2017, Chau had felt uneasy about the pressure that Donovan maintained for her to engage in sex with him and/or his wife. The April 19th assault, coupled with the persistent sexual pressure, caused Chau to feel depressed and upset and experienced other physical symptoms.

59.     Around the late fall of 2017, Chau began to observe the national news surrounding the #MeToo movement and the numerous women who were speaking out about sexual harassment and related abuse that they had suffered in the business environment. Chau also saw the news reports about Bill O'Reilly and Roy Moore. Chau noticed that these reports appeared to be impacting her greatly. They made her very angry, upset, and caused her to suffer significant anxiety.

60.     Chau began to discuss her experiences with Donovan with some of her close friends, who urged her to speak up and seek help.

61.     Chau sought help from a rape crisis hotline ("RAINN") and saw a counselor at a local YMCA. She next treated with a psychiatrist and therapist.

62.     It was through her communications with friends and medical/therapy professionals that she came to realize that the treatment that she had suffered at the hands of

Donovan and the disturbing interactions they engaged in for most of 2017 was wrong, and indeed against the law.

63.     Chau was diagnosed as suffering from post-traumatic stress disorder and depression. In addition, Chau has lost interest in sex with her fiancé and her general enjoyment of and interest in sex has decreased significantly due to the bad memories of Donovan's assaults.

<u>COUNT I</u>
<u>ASSAULT</u>
**(Against Donovan)**

64.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the complaint marked and designated 1 through 64 inclusive, with the same force and effect as if hereinafter set forth at length.

65.     Donovan, as described above, intended to cause Chau to suffer apprehension of an immediate harmful or offensive contact in both April and October 2017, as well as during 2017. Donovan directly and impliedly threatened to withdraw the $25 Million investment and the lucrative job at Granger, unless Chau participated in the sexual conduct he desired.

66.     Donovan's actions did, in fact, cause Chau to fear imminent harmful or offensive contact by Donovan.

67.     As a proximate cause of Donovan's acts, Chau has in the past, and will in the future, suffer damages, including but not limited to, PTSD, depression, severe mental anguish, emotional distress, loss of enjoyment of life, loss of interest in sex, and humiliation, as well as related pain and suffering from physical symptoms.

## COUNT II
## BATTERY
### (Against Donovan)

68.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the complaint marked and designated 1 through 68 inclusive, with the same force and effect as if hereinafter set forth at length.

69.     Donovan intentionally engaged in offensive, harmful, and wrongful, and unwanted bodily contact with Chau, without her consent on the aforementioned occasions in April and October 2017.

70.     Specifically, Donovan unlawfully touched Chau in an offensive and sexual manner on April 19, 2017 in New York City and in October 2017 at the San Diego compliance conference.

71.     As a direct and proximate result of Donovan's offensive, and wrongful and unwanted physical contact of Chau, without her consent, Chau has in the past, and will in the future, suffer damages, including but not limited to, PTSD, depression, severe mental anguish, emotional distress, loss of enjoyment of life, loss of interest in sex, and humiliation, as well as related pain and suffering from physical symptoms.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Donovan)

72.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the complaint marked and designated 1 through 72 inclusive, with the same force and effect as if hereinafter set forth at length.

73.     Donovan, acted in a manner that was extreme & outrageous, intentional, willful, grossly reckless, and for the purpose of causing serious and substantial emotional distress to Chau and/or in reckless and wanton disregard for same.

74.     Donovan abused his position of power of promising millions of dollars in investments and lucrative employment in exchange for Chau's performance of sexual acts.

75.     As a result of the foregoing, Chau has in the past, and will in the future, suffer damages, including but not limited to, PTSD, depression, severe mental anguish, emotional distress, loss of enjoyment of life, loss of interest in sex, and humiliation, as well as related pain and suffering from physical symptoms.

## COUNT IV
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against Donovan)

76.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the complaint marked and designated 1 through 76 inclusive, with the same force and effect as if hereinafter set forth at length.

77.     Donovan's conduct negligently caused emotional distress to Chau.

78.     Donovan could reasonably foresee that his actions would have caused emotional distress to Chau.

79.     Chau was in a specific zone of danger with interacting and meeting with Donovan and at risk of physical harm, causing her fear.

80.     Chau immediately or shortly after interacting with or meeting with Donovan suffered distress and emotional harm.

81.     As a result of the foregoing, Chau has in the past, and will in the future, suffer damages, including but not limited to, PTSD, depression, severe mental anguish, emotional

distress, loss of enjoyment of life, loss of interest in sex, and humiliation, as well as related pain and suffering from physical symptoms.

## COUNT V
## VICARIOUS LIABILITY FOR DONOVAN'S CONDUCT
### (Against Granger)

82.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the complaint marked and designated 1 through 82 inclusive, with the same force and effect as if hereinafter set forth at length.

83.     Granger should be vicariously liable for Donovan's actions because, at all times relevant to the Counts set forth in this Complaint, Donovan was acting within the scope of his employment and furthering Granger's interests.

84.     The communications and related actions that occurred between Chau and Donovan were within the context of Donovan either offering to invest $25 Million of Granger's funds in MotiVentures or attempting to convince Chau to join Granger as an employee.

85.     If Granger invested in MotiVentures and it succeeded, Granger's families would reap the benefits Donovan claimed to exercise considerable control over what where Granger invested its assets.  Donovan misused his position and authority in the company to string Chau along.

86.     Donovan's actions were closely related with what he was hired to do for Granger.

87.     A causal nexus existed between (i) Donovan's grooming of Chau by continuous sexual communications in the context of investment and hiring and (ii) his abuse of power to coerce and batter Chau.

88.     Holding Granger liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to the victim.

89.     As a result of Donovan's actions, Chau has in the past, and will in the future, suffer damages, including but not limited to, PTSD, depression, severe mental anguish, emotional distress, loss of enjoyment of life, loss of interest in sex, and humiliation, as well as related pain and suffering from physical symptoms.

**COUNT VI**
**DISCRIMINATION IN VIOLATION OF N.Y. EXECUTIVE LAW § 296**
**AND NEW YORK CITY ADMINISTRATIVE CODE § 8-107**
**(Against Donovan and Granger)**

90.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the complaint marked and designated 1 through 90 inclusive, with the same force and effect as if hereinafter set forth at length.

91.     Defendants are "employers" within the meaning of New York Executive Law §§ 290, et seq. ("NYSHRL") and the New York City Administrative Code § 8-107 ("NYCHRL").

92.     Chau is a member of a protected class. The harassment and abuse she suffered were directed against her because she is a woman.

93.     Under both the NYSHRL and NYCHRL it is unlawful discriminatory practice for an employer to bar from employment or decline to hire a female because she refuses to submit to the hiring manager's demands to engage in sexual acts.

94.     As set forth above, Defendants engaged in an unlawful discriminatory practice with malice and reckless indifference to Chau's protected rights by Donovan's misusing his position of power by conditioning an extremely lucrative job offer that paid in the range of $750,000 total compensation per year in exchange for sexual favors and threesomes with his wife. This is "textbook" *quid pro quo* sexual harassment against a member of a protected class.

95.     As a result of the foregoing, Chau has in the past, and will in the future, suffer damages, including but not limited to, PTSD, depression, severe mental anguish, emotional distress, loss of enjoyment of life, loss of interest in sex, and humiliation, as well as related pain and suffering from physical symptoms.

## PRAYER FOR RELIEF

**WHEREFORE**, Chau respectfully requests that the Court grant the following relief:

(a)     judgment on Counts I through VI;

(b)     compensatory damages and damages for pain and suffering in an amount to be determined at trial, including punitive damages against all Defendants;

(c)     costs, reasonable attorneys' fees, and interest;

(d)     such other relief as the Court deems just and proper.

## JURY DEMAND

Chau hereby demands a trial by jury on all claims raised in her Complaint that are so triable.

Respectfully submitted,

JENNY CHAU,

By her attorneys,


_____/s/ Mark M. Whitney_____
Mark M. Whitney (SDNY #MW-2648 / NYS # 2605020)
WHITNEY LAW GROUP, LLC
*Main Address:*
  160 Washington Street
  Marblehead, MA 01945
*New York Address:*
  48 Wall Street, 11th Floor
  New York, NY  10005
Phone (781) 631-4400
Fax (781) 205-0967
mwhitney@whitneylawgroup.com

Dated: April 17, 2018

## <u>VERIFICATION</u>

       I hereby certify and affirm, under oath and the pains and penalties of perjury, as follows: (a) I have reviewed this Complaint; (b) with respect to the facts in the foregoing of which I have personal knowledge, I affirm that such information is true and correct; and (c) with respect to the facts in the foregoing position statement of which I do not have direct personal knowledge, I affirm upon information and belief, that such information is true and accurate.

       Signed under the pains and penalties of perjury, this 17th day of April, 2018.


                               _/s/ *Jenny Chau*_
                              Jenny Chau